IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SHAWN A. W.,              ) | |
|                           ) | |
|    Plaintiff,   ) | |
|                           ) | |
| v.                        ) | |
|                           ) | Case No. 20-cv-00663-SH |
| KILOLO KIJAKAZI,[1] Acting ) | |
| Commissioner of Social Security, ) | |
|                           ) | |
|    Defendant.   ) | |

**OPINION AND ORDER**

Pursuant to 42 U.S.C. § 405(g), Plaintiff Shawn A. W. seeks judicial review of the decision of the Commissioner of Social Security (the "Commissioner") denying his claims for disability benefits under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-434, 1381-1383f. In accordance with 28 U.S.C. § 636(c), the parties have consented to proceed before a United States Magistrate Judge. (ECF Nos. 6 and 7.) For reasons explained below, the Court reverses and remands the Commissioner's decision denying benefits.

**I.    Disability Determination and Standard of Review**

Under the Act, a "disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also id.* § 1382c(a)(3)(A) (regarding disabled individuals). The impairment(s) must be "of such severity that [the claimant] is not only unable to do his previous work but cannot,

---

[1] Effective July 9, 2021, pursuant to Fed. R. Civ. P. 25(d), Kilolo Kijakazi, Acting Commissioner of Social Security, is substituted as the defendant in this action. No further action need be taken to continue this suit by reason of 42 U.S.C. § 405(g).

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id*. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Social Security regulations implement a five-step sequential process to evaluate disability claims. 20 C.F.R. §§ 404.1520, 416.920. To determine whether a claimant is disabled, the Commissioner inquires into: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe medically determinable impairment(s); (3) whether the impairment meets or equals a listed impairment from 20 C.F.R. pt. 404, subpt. P, app. 1; (4) considering the Commissioner's assessment of the claimant's residual functional capacity ("RFC"), whether the claimant can still do his past relevant work; and (5) considering the RFC and other factors, whether the claimant can perform other work. *Id*. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). Generally, the claimant bears the burden of proof for the first four steps. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). At the fifth step, the burden shifts to the Commissioner to provide evidence that other work the claimant can do exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

Judicial review of the Commissioner's final decision is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. *See Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The "threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). It is more than a scintilla but means only "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court will "meticulously examine the [administrative] record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met," *Grogan*, 399 F.3d at 1262, but it will neither reweigh the evidence nor substitute its judgment for that of the Commissioner, *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). Even if a court might have reached a different conclusion, the Commissioner's decision stands if it is supported by substantial evidence. *See White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

## II. Background and Procedural History

Plaintiff applied for Title II and Title XVI disability benefits on July 10, 2018, with a protective filing date of July 9, 2018. (R. 21, 263-77.) In his applications, Plaintiff alleged he has been unable to work since January 1, 2008,[2] due to conditions including knee problems, an inability to stand or sit for more than 10 minutes, post-traumatic stress disorder ("PTSD"), bipolar disorder, schizoaffective disorder, anxiety, and an inability to be in large groups. (R. 263, 270, 362.) Plaintiff was 29 years old at the time of the ALJ's decision. (R. 31, 263.) Plaintiff has a high school education and past relevant work as a Packer, Store Laborer, Construction Worker, Industrial Cleaner, Fast Food Worker, and Forklift Operator. (R. 44, 64, 462.)

Plaintiff's claims for benefits were denied initially and upon reconsideration. (R. 147-52, 155-64.) Plaintiff then requested a hearing before an Administrative Law Judge

---

[2] At the hearing, the ALJ accepted Plaintiff's request to amend the alleged onset date to December 15, 2017. (R. 43.) In his decision, the ALJ continued to reference January 1, 2008, as the onset date (*e.g.*, R. 23), while elsewhere he acknowledged an "amended" onset date (R. 28). This discrepancy does not appear to have affected the ALJ's decision and neither party raises it as an issue.

3

("ALJ"), which the ALJ conducted on June 28, 2019. (R. 39-70, 165.) In the six months following the hearing, the ALJ obtained and added to the record, among other things, a consultative examination ("CE") report from Katherine Leahy, LP. (R. 463-64, 466, 1163-68.) Plaintiff did not seek to supplement the record regarding this new evidence. (R. 466.) The ALJ then issued a decision denying benefits and finding Plaintiff not disabled. (R. 18-31.) The Appeals Council denied review on October 14, 2020 (R. 1-5), rendering the Commissioner's decision final, 20 C.F.R. §§ 404.981, 416.1481. Plaintiff timely filed this appeal on December 16, 2020 (ECF No. 2), within 65 days of that order. *See* 20 C.F.R. § 422.210(c).

### III. The ALJ's Decision

In his decision, the ALJ found Plaintiff met the insured requirements for Title II purposes through March 31, 2021. (R. 23.) The ALJ then found at step one that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.[3] (*Id.*) At step two, the ALJ found that Plaintiff had the following severe impairments: (1) osteoarthritis of the right knee, (2) bipolar disorder, (3) anxiety disorder, (4) antisocial disorder, and (5) PTSD. (R. 24.) At step three, the ALJ found Plaintiff's impairments had not met or equaled a listed impairment. (R. 24-26.)

After evaluating the objective and opinion evidence, as well as Plaintiff's testimony, the ALJ concluded Plaintiff had the RFC to "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)" with various physical limitations and the following mental limitations:

---

[3] Again, the ALJ listed this date as January 1, 2008. (R. 23.) However, as the ALJ noted Plaintiff's non-substantial gainful activity in 2019 (*id.*) but not his substantial gainful activity in 2017 (*e.g.*, R. 289), it appears the ALJ was intending to refer to the amended date of December 15, 2017.

4

> He can understand, remember, and apply instructions to perform simple tasks (jobs SVP 2 and below); make work decisions commensurate with those tasks; concentrate to work at a consistent pace for two-hour periods before and after customary breaks throughout the workday but not at a production rate pace such as on an assembly line where each task must be completed within a strict time deadline.  He can tolerate occasional interactions with coworkers in tasks that do not require tandem tasks and no interactions with the general public.

(R. 26.)  The ALJ then provided a recitation of the evidence that went into this finding. (R. 26-29.)  At step four, the ALJ found Plaintiff unable to perform his past relevant work as a Packer, Store Laborer, Construction Worker, Industrial Cleaner, and Fast Food Worker.[4] (R. 29.)  Based on the testimony of a vocational expert ("VE"), however, the ALJ found at step five Plaintiff could perform other work that existed in significant numbers in the national economy, such as Injection Mold Machine Tender, Wire Wrapping Machine Operator, and Inserting Machine Operator.  (R. 29-30.)  Accordingly, the ALJ concluded Plaintiff was not disabled.  (R. 30.)

## IV.   Issues

Plaintiff argues the ALJ's decision was not based on substantial evidence, because it failed to properly consider Plaintiff's inability to interact appropriately with supervisors. (ECF No. 17 at 8-15.)  More specifically, Plaintiff argues the ALJ erred in (1) discounting Plaintiff's symptoms and testimony regarding his actions (*id*. at 9-11); (2) ignoring evidence in the record, including examples of further mental health symptoms (*id*. at 11-12); (3) failing to incorporate a limitation articulated in the prior administrative findings,

---

[4] The ALJ failed to state whether Plaintiff could perform his past work as a Forklift Operator, which the VE testified should have been added to Plaintiff's work history (R. 64).  However, this omission was harmless.  The job of Forklift Operator requires the capacity to engage in medium exertion level work.  *See* Dictionary of Occupational Titles ("DOT") § 921.683-050, Industrial Truck Operator, 1991 WL 688069 (4th ed. 1991).  This job would have been precluded by the limitation in the final RFC of light work (R. 26).

5

which the ALJ found persuasive (*id.* at 9, 12-13); and (4) finding unpersuasive the post-hearing medical opinion of consultative examiner Katherine Leahy, LP (*id.* at 9, 13-14).

After reviewing the ALJ's decision, the Court agrees that the ALJ's treatment of the record was improper. Particularly, the Court finds the ALJ relied on a flawed analysis to discount the medical opinion of Katherine Leahy, LP. For this reason, the undersigned reverses and remands for proceedings consistent with its Opinion and Order.

## V.     Analysis

One of the general requirements of competitive, remunerative work is the ability to respond appropriately to supervision. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *6 (July 2, 1996); *see also* SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985). Plaintiff contends "one of [his] primary limitations in maintaining any type of employment [is] his inability to interact appropriately with supervisors or those who ha[ve] authority over him." (ECF No. 17 at 9.)

### A.     The Evidence in the Record

As noted above, Plaintiff asserts that evidence of this supervisor-related limitation may be found in his own symptom reports, in the prior administrative findings, in the opinion of the consultative examiner, and in his extensive treatment records.

First, Plaintiff points to his own testimony and subjective reports where he describes a history of difficulty interacting with supervisors and others generally. (ECF No. 17 at 2-8.) Instances Plaintiff describes include becoming angry with his neighbors and thinking about blowing up their home (R. 595); voluntarily entering inpatient treatment due to homicidal ideation toward his brother-in-law (R. 547); being discharged from the military for punching his commanding officer (R. 768);[5] picking fights with

---

[5] At the hearing, Plaintiff testified that he had never served in the military. (R. 58.)

6

others to cope with his mental health issues (R. 1033); voluntarily entering inpatient treatment after getting into a verbal and physical altercation with his wife (R. 835-36, 838); reporting that if an employer did not let him leave a job site voluntarily he would "get violent" (R. 57); and otherwise losing jobs for threatening to kill and "stalking" a supervisor (R. 50-51), trying to run a supervisor over with a forklift and hitting him (R. 51), and picking a boss up by the throat and trying to kill him (R. 52).

Second, Plaintiff highlights the medical opinions contained in the record, asserting they show his inability to handle supervision. (ECF No. 17 at 9, 12-13, 15.) Specifically, Plaintiff notes the prior administrative medical findings of Drs. Kim Dempsey and Tiffany Iskander in October and December 2018. (*Id.* at 9, 12-13.) Both found Plaintiff moderately limited in his ability to interact appropriately with the general public, but not significantly limited in his abilities to "to accept instructions and respond appropriately to criticism from supervisors" or "get along with coworkers or peers without distracting them or exhibiting behavioral extremes." (R. 84, 100, 123, 141.) When explaining Plaintiff's social capacities and/or limitations in narrative form, however, both stated, "[C]laimant would function best in a setting where there is little need for direct supervision or frequent interactions with coworkers and members of the public." (*Id.*)

Later, in August 2019, the consultative examiner Katherine Leahy issued her opinion. (R. 1163-68.) In it, she chose the highest level of impairment ("extreme") to describe Plaintiff's ability to interact appropriately with supervisors and make judgments on work-related decisions. (R. 1166-67.) She also opined that Plaintiff "could not sustain appropriate relationships with supervisors, coworkers, and the general public and in fact appears to pose a safety threat to them." (R. 1165.)

7

Finally, Plaintiff sets forth medical evidence he contends supports this limitation. (ECF No. 17 at 2-7.) Though the Court will not summarize the entirety of the records cited, such objective examinations often indicated, for example, that Plaintiff intermittently presented with impaired insight, poor judgment, or poor impulse control. (*See, e.g.*, R. 502-03,[6] 549, 838-39.)

The ALJ found Plaintiff's subjective complaints—including his inability to tolerate supervision—were less severe than alleged. (R. 28.) As for the prior administrative findings, the ALJ found them "generally persuasive." (*Id.*) However, he found Ms. Leahy's opinion "not entirely persuasive," determining that her findings were inconsistent with the record. (R. 28-29.)

As a result, the ALJ set forth an RFC that incorporated limitations in Plaintiff's ability to interact with coworkers and the public, but which did not include <u>any</u> limitations relating to Plaintiff's interactions with supervisors. (R. 26.)

### B.     **Evaluation of Katherine Leahy's Opinions**

#### 1.     **Consideration of medical opinions in general.**

When considering an individual's claim of disability, the ALJ does not give any specific evidentiary weight to medical opinions. 20 C.F.R. § 404.1520c(a) (Title II).[7] Instead, the ALJ evaluates the persuasiveness of all medical opinions by considering the following factors: (i) the supportability of the opinion; (ii) the consistency of the opinion; (iii) the medical source's relationship with the claimant (including length of treatment

---

[6] In addition to presenting with poor insight, upon a mental status exam on July 3, 2018, Plaintiff was adjudged to have an "[i]nability to sustain consistent work behavior." (R. 502.)

[7] *See also* 20 C.F.R. § 416.920c for the regulation governing medical opinions in Title XVI claims.

relationship, frequency of examinations, purpose and extent of treatment relationship, and examining relationship); (iv) the medical source's specialization; and (v) any other factors that tend to support or contradict the opinion. *Id.* § 404.1520c(c).

While the ALJ considers all five factors, he generally must discuss only two—supportability and consistency. *Id.* § 404.1520c(b)(2). Supportability refers to information internal to the medical source offering the opinion: "The more relevant the objective evidence and supporting explanations presented by a medical source are to support . . . her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be." *Id.* § 404.1520c(c)(1). Consistency, meanwhile, is external: "The more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." *Id.* § 404.1520c(c)(2). Supportability and consistency are the most important factors, and the ALJ must explain how both factors were considered. *Id.* § 404.1520c(b)(2).

### 2. Evaluation of Ms. Leahy's opinions.

As noted *supra*, Ms. Leahy opined that Plaintiff "could not sustain appropriate relationships with supervisors . . . and in fact appears to pose a safety threat to them." (R. 1165.) She also found that Plaintiff was extremely impaired in his ability to interact appropriately with supervisors and make judgments on work-related decisions. (R. 1166-67.) Ms. Leahy noted that these impairments were evident due to Plaintiff's demonstrative "aggression," lack of "impulse control," and propensity "to do only what he wants to do – depending on his labile mood of the moment." (*Id.*)

The ALJ found Ms. Leahy's opinion unpersuasive because its "extreme limitations" were "not entirely consistent with other objective evidence." (R. 28.) Particularly, the ALJ noted that Plaintiff had told Ms. Leahy "he was involved in medication management

9

at the time of the examination," but the ALJ found the record showed "no evidence of treatment for three months before this appointment and several periods since the amended alleged onset date when the claimant was not on any medications." (R. 28-29.) The ALJ then concluded: "Considering that the claimant has demonstrated significant improvement when he has been engaged in treatment, the evidence suggests limitations more consistent with the opinions in [the prior administrative findings]." (R. 29 (citation omitted).)

These statements are unsupported by, and misstate, the record. The Court, therefore, finds that the ALJ's decision is not supported by substantial evidence.

### a)   Consistency

Based on the ALJ's relatively short discussion of Ms. Leahy's exam, it appears he primarily discounted her opinion because it stated Plaintiff "is participating in medication management" (R. 1163), which the ALJ seemed to believe was false. The ALJ based this finding not on the <u>presence</u> of any affirmative evidence in the record but, instead, on its <u>absence</u>—"there is no evidence of treatment for three months before th[e] appointment" with Ms. Leahy in August 2019. (R. 28.) The problem with this, however, is that the ALJ was looking for evidence in an empty file. There <u>could not</u> be any record of Plaintiff's medical treatments in—at a minimum—the two months prior to his appointment with Ms. Leahy, and there would likely not be any relevant records for the third month either.

As the ALJ noted, Plaintiff submitted all written evidence at least five days before the hearing on June 28, 2019. (R. 21, 39.) This included records from Grand Lake Mental Health through May 13, 2019 (R. 1137-61.), which Plaintiff had requested on May 29, 2019 (R. 458-59). As such, the record <u>ended</u> three months before the consultative exam, and was <u>closed</u> two months before the exam. When—after the hearing—the ALJ proposed to

enter Ms. Leahy's opinion into the record, the parties were informed they had the right to submit any additional records they wished the ALJ to consider. (R. 463-64.) But, as Ms. Leahy's records showed that Plaintiff <u>was</u> participating in medication management, there was no reason why Plaintiff would know the ALJ intended to disbelieve this statement or that he needed to submit additional evidence to <u>prove</u> the record was correct. Thus, it was improper for the ALJ to use a lack of evidence post-dating a closed record as a reason to discount the evidence already in the record.

Once the ALJ's erroneous finding is excluded, all that is left is his statement that there were "several periods since the amended alleged onset date when the claimant was not on any medications." (R. 28-29) First, as all the information <u>in the record</u> indicated that Plaintiff was on medication in May 2019 (R. 1141) and still on medication in August 2019 (R. 1163), it is unclear what relevance the remainder of the ALJ's conclusion would have, even if true. Second, this statement was also unsupported.

The ALJ cites just one record in his decision for the proposition that Plaintiff was non-compliant with prescribed medication—a notation from May 13, 2019 (R. 28), in which Plaintiff reported to Grand Lake Mental Health Center that he had been out of Depakote and Seroquel for between 1.5 and 2 months. (R. 28 (citing R. 1138).[8]) However, on April 19, 2019, <u>also at Grand Lake</u>, the record contains a notation where Plaintiff stated he was "on medication but feels that it needs to be increased." (R. 1144.) Plaintiff's testimony at hearing does not substantially clarify the matter. (R. 62 (when asked about the period of potential noncompliance, Plaintiff vaguely described filling his prescriptions but waiting for a "medical card" while moving between Kansas and Oklahoma).)

---

[8] The ALJ actually cites the first page of this record, R. 1137 (R. 28 (citing "Exhibit 14F at 1"), but the Court assumes the ALJ intended to refer to the next page.

11

Moreover, Plaintiff's prior treatment records are similarly inconsistent. (R. 861-62 (on January 9, 2019, Plaintiff appears to be given a three-month prescription of Depakote).) The ALJ should have resolved any ambiguities in the record before relying on this evidence. *See* SSR 96-8p, at *7 ("The adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."). More importantly, the ALJ failed to explain how a record that showed Plaintiff potentially ran out of medication when moving between states could possibly support the finding that he was out of compliance with medication during "several periods," not just one.

Finally, there are problems with the conclusion the ALJ draws from his (unsupported) statement that Plaintiff was medication non-compliant on "several periods" and his inference that Ms. Leahy was, therefore, incorrect when she stated that Plaintiff was participating in medication management.

After making these factual findings, the ALJ reasoned that Ms. Leahy's opinions were inconsistent with record evidence because Plaintiff "demonstrated significant improvement when he has been engaged in treatment . . . ." (R. 29 (holding that "the evidence suggests limitations more consistent with the opinion in" the prior administrative findings.) Multiple times in his decision, the ALJ noted "records reveal that the claimant's symptoms improved quickly with medication and therapy." (R. 27-28; *see also* R. 28 ("again, his symptoms improved with medication management and therapy").) In support of this finding, the ALJ cites two types of records.

First, the ALJ bases this finding on the statement that "[t]reatment notes disclose that the claimant does not maintain strict compliance with his medication and that his symptoms worsen significantly without medication (Exhibit 14F at 1)." (R. 28.) As noted

12

above, this appears to be a reference to a single record where Plaintiff attempted to establish treatment with a new provider in Oklahoma after moving from Kansas.[9] (R. 1138.)

Second, the ALJ states, without citation,[10] that in 2019, Plaintiff "was . . . admitted for inpatient care and, again, his symptoms improved with medication management and therapy." (R. 28.) However, nowhere in the ALJ's decision did he articulate for review how improvement of Plaintiff's symptoms while hospitalized could be seen as showing his capabilities outside a highly structured environment like inpatient treatment. That is, when considering a claimant's RFC, the ALJ must take into account all relevant evidence in the case record, including "effects of treatment, . . . limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine," etc.), as well as the need for a structured living environment. SSR 96-8p, at *5; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(6)(b) (noting that a claimant's "ability to complete tasks in settings that are highly structured, or that are less demanding or more supportive than typical work settings[,] does not necessarily demonstrate [a

---

[9] This record does not state that Plaintiff's symptoms were significantly worse than they had been on medication, though the ALJ may have been comparing—without saying so— the description of Plaintiff's symptoms in this record with those in another, unspecified record.

[10] Because the ALJ failed to provide a citation for this statement, the Court is unable to determine what improvement the ALJ intended to reference. In an effort to show deference to the ALJ's findings, the Court has reviewed the records for Plaintiff's inpatient treatment from January 6 to 9, 2019, which would fit the time period referenced. (R. 809-983.) These records appear to show that, while in inpatient care, Plaintiff continued to receive one of his home medications (Depakote), while another medication (Zyprexa) was discontinued and a third medication (Seroquel) was added; Plaintiff participated in group and one-on-one sessions; and Plaintiff reported an improvement in mood, impulsivity, and agitation. (R. 858.) Prior to discharge, the hospital also contacted Plaintiff's wife to help coordinate Plaintiff's continued outpatient treatment; to ensure removal/locking of all weapons and medications in the home; and to coordinate administration of Plaintiff's medications and supervision "for safety." (*Id.*; *see also* R. 861-62.)

claimant's] ability to complete tasks in the context of regular employment during a normal workday or workweek"). Other courts have found that a plaintiff's performance in such settings is insufficient to support an ALJ's rejection of a medical opinion. *See, e.g., Cearley v. Berryhill*, No. CIV-16-127-SPS, 2017 WL 4233273, at *5 (E.D. Okla. Sept. 25, 2017). The ALJ does not appear to have considered the effect that the structured nature of Plaintiff's in-patient treatment had on his apparent improvement of symptoms in this single instance the ALJ referenced.

Lastly, other evidence in the record contradicts the ALJ's finding that Plaintiff generally improved with medication management and therapy. There are numerous instances in which Plaintiff reported continued symptoms while taking medication. (*See, e.g.*, R. 595 (presenting for mental health treatment because he "does not think Depakote is helping"), R. 787 (wishing to increase his Depakote and Zyprexa because his mood was "not so good"), R. 817 (presenting for inpatient treatment after being physically aggressive with wife even though he was on 3500 mg of Depakote daily).) The ALJ failed to mention this evidence. An ALJ may not mischaracterize evidence, *Talbot v. Heckler*, 814 F.2d 1456, 1463-64 (10th Cir. 1987), or fail to explain contrary evidence not relied upon, *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). The ALJ must remedy this on remand.

As such, based on the reasons the ALJ provided, his finding that Katherine Leahy's opinion was inconsistent with the record was not supported by substantial evidence.[11]

---

[11] Of course, on remand the ALJ is free to offer myriad reasons why Ms. Leahy's opinion <u>is</u> inconsistent with the record. The undersigned does not determine the consistency or persuasiveness of her opinion one way or the other. The Court merely reverses the decision for further consideration because the reasons offered by the ALJ do not survive scrutiny.

### b) Supportability

Moreover, it is not apparent from the ALJ's discussion of Ms. Leahy's opinion that he considered the supportability of her findings. (R. 28-29.) Per 20 C.F.R. § 404.1520c(b)(2), the ALJ <u>must</u> articulate how he considered both the supportability and consistency factors in his evaluation of a medical opinion. *Id.* ("[W]e <u>will</u> explain how we considered the supportability and consistency factors for a medical source's medical opinions" (emphasis added)). The ALJ is required to articulate his findings on this factor, and he should be sure to do so on remand.

### C.     The ALJ's Error was not Harmless

Finally, the undersigned considers whether the ALJ's error was harmless, as alleged by the Commissioner (ECF No. 22 at 7-8). The Court finds that it was not.

The harmless error doctrine is applied cautiously in the context of social security disability cases. *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005). Even so,

> it nevertheless may be appropriate to supply a missing dispositive finding under the rubric of harmless error in the right exceptional circumstance, i.e., where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.

*Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004). However, to the extent any "harmless-error determination rests on legal or evidentiary matters not considered by the ALJ, it risks violating the general rule against post hoc justification of administrative action . . . ." *Id.* The undersigned "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." *Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007). Specifically, courts may not engage in a "post hoc effort to salvage the ALJ's decision [that] would require [it] to overstep [its]

institutional role and usurp essential functions committed in the first instance to the administrative process." *Allen*, 357 F.3d at 1142.

As noted above, it is the ALJ's duty to resolve any inconsistencies or ambiguities in the record. It is also the ALJ's responsibility to properly evaluate all medical opinions. The Court is prohibited from reweighing evidence, *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007), which includes performing a persuasiveness analysis in these circumstances. The Commissioner does not argue the Court should do so here, and the Court cannot say that <u>no</u> reasonable administrative factfinder could have found differently than the ALJ did regarding the persuasiveness of Ms. Leahy's opinion.

Instead, the Commissioner argues that the ALJ did not err because "the general requirement with respect to dealing with people" dictated by the representative jobs was minimal. (ECF No. 22 at 8.) The Court agrees that the "people" rating was the lowest possible.[12] The Court disagrees, however, that such jobs would necessarily be available had the ALJ properly evaluated Ms. Leahy's opinion. Portions of the record—including Ms. Leahy's opinion—portray Plaintiff as an individual who may, upon further examination, be <u>completely prohibited</u> from interacting with supervisors, not merely limited. Therefore, the Court does not find that based on the evidence the ALJ at least

---

[12] The representative jobs the ALJ found Plaintiff capable of performing (R. 30) had a "people" rating of 8. *See* DOT § 556.685-038, Injection Molding Machine Tender, 1991 WL 683482 (4th ed. 1991); DOT § 726.682-014, Wire Wrapping Machine Operator, 1991 WL 679591 (4th ed. 1991); DOT § 208.685-018, Inserting Machine Operator, 1991 WL 671755 (4th ed. 1991). As the Commissioner notes (ECF No. 22 at 8), the "people" rating—which involves "taking instructions [and] helping"—is rated on a scale of 0-8, with 8 being the lowest level of interaction possible, *Lane v. Colvin*, 643 F. App'x 766, 770 n.1 (10th Cir. 2016) (unpublished). That being said, even jobs with a people rating of 8 require some interpersonal interaction—i.e., "taking instructions," which refers to "[a]ttending to the work assignment instructions or orders of supervisor" with "[n]o immediate response required unless clarification of instructions or orders is needed." DOT App. B - Explanation of Data, People, and Things, 1991 WL 688701.

16

considered, no other reasonable factfinder could have resolved the matter another way. The ALJ's error was not harmless and must be resolved on remand.

## VI.  Conclusion

The ALJ's decision finding Plaintiff not disabled is **REVERSED and REMANDED** for proceedings consistent with this Opinion and Order.

**SO ORDERED** this 16th day of March, 2022.

                                     **SUSAN E. HUNTSMAN, MAGISTRATE JUDGE**
                                     **UNITED STATES DISTRICT COURT**